Green, J.
The facts of this case appear to be these: *517 James Markham was a captain in the Virginia navy as early as 1779, and continued in actual service until April 1781, when commanding the Tempest, lying in James river, not far below Richmond, his ship was captured, and he taken prisoner, by a detachment of the british army, under the command of general Philips; and he, together with some officers of the Chesterfield militia, and one of his lieutenants, taken prisoners at or about the same time, were paroled on the 28th April 1781. He continued an unexclianged prisoner of war, until the return of peace. The copy of the instrument of parol in the record is dated Camp Osborne’s, April 28. 1780. But this is an obvious mistake in the year: for the instrument states, that the prisoner was made so by the british troops under the command of major general Philips, and that Markham was a captain of the navy, commanding the Tempest. The certificate of major Harris, one of the prisoners, states, that he and Markham, with several others, wore made prisoners by a detachment of general Philips’s army, under the command of general Arnold, and paroled on the 27th April 1781. It is too, an historical fact, that Arnold invaded Virginia late in December 1780, and was in Richmond early in January 1781, when he returned to Hampton, where he remained until the arrival of general Philips in April; tvhon the whole force under the command of general Philips moved up James river. And the particular engagement, in which several vessels were destroyed, and these prisoners were taken, is noticed in the histories of the war. Besides, it appears, from the cotemporary acts of the government, that in June 1780, the Tempest was not in a condition for service, and with other ships was then ordered to he repaired, manned, and made ready for the defence of the bay and sea coast, against the apprehended invasion which afterwards took place.
The act of May 1779, ch. 6. “ concerning officers, soldiers, sailors and marines,” provided, that the officers of the army, both in the state and continental lines, who should serve until the end of the war, and also supernumerary offi *518 cei'g, under certain circumstances, should be entitled to half pay during life, to commence from the termination of their command or service. This act did not extend to the officers of the navy. But, in the session of May 1780, an act passed (ch. 27.) founded upon a series of resolutions, reported by a committee; two of which were in these words: “ Resolved, that there be a reform in the navy officers, retaining in the service as many as shall be necessary to command the armed vessels belonging to the commonwealth, of such as are most able and best qualified for the navy service ; and that, for the purpose of making this reform, a board shall be constituted, to consist of the commissioner of the navy, and six navy captains, the most approved for their ability, which six captains, shall previous to their appointment to this board, be fixed in their command by the governour with the advice of council”—And, “ Resolved, that all commissioned officers, the master surgeon and surgeon’s mate, in the service of the navy, be entitled to half pay during life, under the same restrictions and limitations as are included in the act of assembly 1 concerning officers, soldiers, sailors and marines.’” The act founded upon the string of resolutions, of which the foregoing are a part, followed them, in the main, literally; and, in those respects in which it departed from the phraseology of the resolutions, were indistinct as to the particulars, in which the resolutions were distinct. It seems indeed as if it had been framed under the mouths of the enemy’s cannon. Thus, the matter of the two resolutions above quoted, are framed in the act, in this form : “ And whereas it is necessary, that no officer should be retained in the marine department, but such as are properly qualified, in order, therefore, to produce this reform, Be it enacted, that a board shall be appointed by the governour with the advice of council, to consist of the commissioner of the navy, and. of six of the captains the most approved for their ability, any four of whom, together with the said commissioner of the navy, shall be sufficient to constitute the said board, having been first fixed *519 in their command in the navy, by the governour with the advice of council; and which said six captains, previous to their appointments to the said board, and before they proceed to business, shall take the following oath: I, A. B. do swear, that I will well and truly discharge the trust in me reposed, for the purpose of producing a reform in the navy, agreeable to the intention of this act, and that I will do the same to the best of my skill and judgment, without favour, affection or partiality.” And this is every word in the act touching this subject of reform in the navy. The act proceeds (pursuant to another of the aforesaid series of resolutions) to authorise the appointment of captains and other officers and the enlistment of marines; and then proceeds: “ And be it further enacted, that the said captains, together with the subalterns, and all other commissioned officers of the navy, the master surgeon and surgeon’s mates, shall bo entitled to the same pay and rations, the same privileges and emoluments, and rank in the same degree with the officers of the like rank belonging to the regiments heretofore raised for the internal defence of this state.” What was done under the provisions of this act in respect to reforming the officers of the navy, does not appear, the journals of the executive council, from about the time of the passing this act, until January 1781, being lost or destroyed. But it is clear, from the subsequent act of November 1781, ch. 19. (10 Hen. stat. at large, pp. 462, 7.) that it was executed: for the 14th section of that act provides, “ that the officers and seamen of the navy of this state, as they stand arranged hy a late regulation, shall be entitled to the same advantages, as the officers belonging to this state in the land service agreeable to their respective ranks.” The late regulation here referred to, could be no other than that made under the act of May 1780, for the reform of the naval officers. And the above recited clauses of the acts of May 1780 and November 1781, and one found in the act of October 1782, ch. 35. § 3. (11 Hen. stat. at large, p. 161.) providing, that “ all officers, seamen, marines, or their representatives, *520 shall he entitled to the same bounty in lands, and other emoluments, as the officers and soldiers of the Virginia line on continental establishment,” are the only legislative provisions, under which the officers of the navy could claim to be entitled to half pay for life, under any circumstances. And if any were entitled thereto, it could be only such as were selected and remained in service, according to the regulation made by the board organized under the act of May 1780.
If, therefore, captain Markham was taken prisoner and paroled in April 1780, he could not be so entitled without proof, that he had been so selected; for it cannot be presumed, that in selecting officers for immediate and active service, one in his situation, a prisoner on parol, would have been preferred. But if, as I think was clearly the fact, he was taken prisoner commanding the Tempest in April 1781, he was one of those so selected, and entitled to every right conferred on the officers of the navy by the before recited clauses of the acts of 1780, 1781 and 1782.
Was one of those rights that of receiving half pay for life, upon the conditions prescribed by the act of 1779 ?
It was insisted, that the legislature had recognized this right as existing in favour of the officers of the navy, in the instance, in which, by a joint resolution of November 31. 1782, they allowed half pay to commodore Taylor for life. That case is however open to this remark, that it appears from the recitals of the resolution, that this was a bounty in consideration of his having received a severe wound in battle, and not as the concession of a right; for he had, in consequence of that wound, retired from the service as early as 1778, and could claim half pay under no construction of the laws whatever.
The legislature, however, seemed to admit this right by the act of May 1783, ch. 22. (11 Hen. stat. at large, p. 265.) which directed, “ that the auditors should yearly issue to such of the officers of the state line and navy, as are by law entitled to half pay, their warrants for the same.” And *521 the executive have made the same admission, repeatedly; as, by the order in council of January 17. 1782, directing the organization of a board of officers, for the purpose discriminating such officers, both of the army and navy, as by unworthy conduct or otherwise, be thought unfit to be considered as entitled to half pay, in pursuance of the act of November 1781, ch. 19. § 10. although the act, by its terms, confined such inquiry and discrimination to the officers of the army only: and again, by an order of council of May 13. 1784, organizing a board of officers, for making such a discrimination between officers of the navy only, in respect to whom the former order had not been executed by the former board.
Under this last order of May 1784, the board of officers acted, and made a report, which the executive approved, and transmitted to “the auditors, as their guide in granting half pay to the officers of the navy.”
In the mean time, the legislature, by a joint resolution of both houses, having the form of a law, on the 22d December 1783, directed “the auditors not to issue any more warrants for the half pay of the officers of the state line, until the further order of the general assembly.” And no further order has since been given by the assembly upon the subject, except that, by the act of October 1790, ch. 21. (13 Hen. stat. at large, p. 131.) it was provided, that, “whereas doubts have arisen whether certain officers hereinafter described, have a right to the compensation of half pay; for the removal of such doubts,” it was enacted, “that the same compensation of half pay should be extended to those officers of the state line, who continued in actual service to the end of the war, as was allowed to the officers of the continental line; and also to those who became supernumerary and being afterwards required did again enter into actual service and continue therein to the end of the war; any act or acts to the contrary notwithstanding.” The act of May 1783 authorised warrants for half pay to issue to officers of the state line and navy. The resolution of December 1783, *522 prohibited their issuing to officers of the state line only; not in terms embracing those of the navy: a distinction for which j can conceive no possible reason. The order in council of May 13th 1784, before mentioned, and another of May 27th, transmitting the report of the board of officers to the auditors, as their guide in allowing half pay to the officers of the navy, indicate, that the executive did not consider the resolution of December 1783, as extending to the officers-of the navy, nor in respect to them, as suspending the execution of the act of May 1783. But it seems to me, that the case of the officers of the navy came within the reason of that resolution, and was consequently embraced in it;- and if so, that resolution being revoked by the act of 1790, as to such officers of the state line as came within the description of that act, was also, upon an equitable construction, revoked as to the officers of the navy of the same description, the revocation being in the same terms as the prohibítion—officers of the state line. The only difference between holding that the officers of the navy were, or were not, embraced in that prohibition and revocation, is, that, if not embraced in it, they might claim under the act of May 1779 (if they could claim at all) when they had served to the end of the war, from that time or from the date of their commissions, or being supernumerary, again entered into the service, if required so to do, and continued therein until the end of the. war: hut if embraced in it, then they could claim (if at all) only under the act of 1790, by shewing that they continued in actual service to the end of the war, or being supernumerary did again enter into actual service, and continue therein to the end of the war—the difference between the two acts, so far as related to an officer who was a prisoner upon parol, being that arising from the difference between the expressions “ in service,” and “ in actual service.” This difference in the phraseology of the two acts, does not, I think, vary their construction, in respect to the case of a prisoner of war upon parol, who, as was held by the court of appeals in Nelson’s case, decided in 1791, was in actual *523 service, within the spirit of the act of 1790. Neither the resolutions of December 1783, nor the last mentioned act, presented any impediment to Markham’s claim to his warrant for half pay during his life, under the act of May 1783, if he was an officer legally entitled thereto. And being an officer of the navy, selected and retained under the act of May 1780, and having served thenceforth to the end of the war, he was entitled, if any officer of the navy could be entitled, under any circumstances.
I have already noticed that there is no act, which in terms allowed half pay in any case to any officers of the navy. They were allowed the same privileges, emoluments and advantages, as the officers of the army. And but for the cotemporary construction given to those terms by the act of May 1783, and the proceedings of the executive before noticed, 1 should have thought it extremely doubtful, whether those expressions included the contingent half pay, as there were many privileges (such as an exemption from taxes during service) emoluments (such as the right to a supply of necessaries of all sorts, at prime cost, through the agency of public functionaries &c.) and advantages (such as having their pay made good from the 1st January 1777, according to the scale of depreciation) to which those expressions might be applied, without embracing the contingent bounty of half pay. And there are other circumstances which seem to indicate, that half pay was not contemplated by the provisions. Yet, upon the whole, the question, as an original one, is so doubtful, that I think the cotemporary interpretation adopted by the legislature and executive, ought now to prevail; and that captain Markham should be declared to have been entitled to half pay during his life, to commence from the time of the general exchange of prisoners, which was the 1st May 1783. Consequently, that the first half pay was due May 1. 1784, the act of May 1783, directing the warrants for half pay to be issued yearly.
After this opinion was announced, two other questions arose, and were argued at the bar: 1. Whether captain *524 Markham’s representative was entitled to half pay for his life, or to the commutation of five years’ full pay ? 2. Whether he was entitled to interest ?
Green, J.
In all the cases, in which, after the passage of the act of 1790, the district court gave judgment in favor of officers claiming half pay, they were allowed the commutation of five years’ full pay, with interest, from the date of the proclamation of peace, at the rate of six per cent, in lieu of half pay. This was founded upon the idea, that the expression in the act of 1790, “ as was allowed to the officers of the continental line,” was intended to give those of the state line, the same commutation, which had been given by congress, to the officers of the continental line. And the court of appeals sanctioned this construction ; for whilst they reversed almost all the judgments of the general court upon the ground that the officers in question, had not served until the end of the war, and were, therefore, not entitled under the act of 1790, or the pension laws, yet they affirmed the judgments in three cases, in which they held that the parties had served to the end of the war. One of these, was that of Churchill Gibbs, who was taken prisoner in May 1781, and continued a prisoner of war from that time till the end of the war. It was only by force of the provisions of the act of 1790, that commutation and interest, in lieu of half pay for life, could be allowed. That act was confined, in its terms, to officers of the state line, not extending to those of the navy, and the former laws, putting the officers of the navy upon the footing of those of the army, in respect to all privileges, emoluments and advantages, referred only to such as were then allowed them, and not to such as might thereafter be allowed ; consequently, officers of the navy could not claim commutation under the act of 1790, and Markham, was entitled to half pay from the 1st May 1783, when he was exchanged, until his death, according to the opinion originally given in this case; but without interest, for the reasons assigned in Lilly’s case,