Parker, J.
It appears, that Henry Tatum was a lieutenant in the Virginia line on continental establishment, and continued in service, it seems, from March 1776 until the new arrangement of the army was made in the fall of 1778, when he became a supernumerary officer, and so remained till the end of the war. He claims to be entitled to half pay under the act of May 1779, ch. 6. That was an act manifestly intended to hold out inducements to persons to enter and to continue in the service, which at that time it wás absolutely necessary to offer, in consequence of the rapid depreciation of the paper money in circulation, and of the utter inadequacy of the pay then given. Its words are these: “ All general officers of the army, being citizens of this commonwealth, and all field officers, captains and subalterns, commanding, or who shall command, in the battalions of this commonwealth on continental establishment, or serving in the battalions raised for the immediate defence of this state, or for the defence of the United States, and all chaplains, physicians, surgeons, and surgeon’s mates, being citizens of this common *58 wealth, and not being in the service of Georgia or of . any other state, provided congress do not make some tantamount provision for them, who shall serve hence-L forward, or from the time of their being commissioned, until the end of the war; and all such officers who have or shall become supernumerary on the reduction of any of the said battalions, and shall again enter into the said service, if required so to do, in the same or any higher rank, and continue therein until the end of the war, shall be entitled to half pay during life, to commence from the determination of their command or service.”
We are saved much trouble in settling the true construction of this act, by Markham's and Lilly's cases, decided in this court, and in my opinion properly decided. 1 Leigh 516. 525. The latter case, particularly, settles the point that a supernumerary officer, not entering again into service, (unless he was called on and refused so to do) is entitled under the act to half pay for life. ' It also decides, that lapse of time, similar to that occurring in this case, does not afford any presumptiou of payment or abandonment of the claim. Indeed, the circumstances here are stronger to account for the delay; because claims less questionable had been repelled, and the door shut against the claimants, by the resolutions of the legislature and the decisions of the court of appeals in Innis v. Roane, 4 Call 379.
If officers of the state line, becoming supernumerary after the act of 1779, and actually serving until February 1783, when the war was substantially at an end, were driven away and denied relief under that act, it could not be expected of Tatum, and others in the same predicament, to present and make continual claim of their title to half pay. Their laches, under such circumstances, is no evidence of payment or abandonment ; and I am not prepared to presume a fact, which I know not to exist.
*59 The first clause of that part of the act of 1779 already .... .. . , , cited, applies, m terms, as well to officers in the battalions of the commonwealth on continental establishment, being citizens, as to officers of the state line proper. It is impossible to make this plainer by argument. The words “ such officers,” in the second clause, can refer to no other than the officers on continental establishment and in the immediate service of the state, mentioned before. Supernumeraries of that class and description, who had, as well as those who thereafter should, become such, were to be entitled to half pay during life.
Then, as it would seem to me, there is really but one question in this case about which ihere is a reasonable doubt, unless we are prepared to overturn the principles adjudged in Lilly's case, and to decry the many subsequent judgments rendered in this court in conformity with it; and that question is, whether the act of 1779 embraces supernumeraries before, as well as after, the date of the act? Lilly's case, it may be said, is not an authority upon this point, because Lilly became a supernumerary after May 1779; but it is apparent that the majority of the court recognized no such distinction, nor did the dissenting judge allude to it. On the contrary, all the concurring judges speak broadly of supernumeraries, before, as well as after, the date of the act; and the train of reasoning by which they justified their decision applies as strongly to the one class as the other. Thus judge Carr says-—“At the passage of this act, the history and laws of the period tell us, there were a groat number of supernumeraries; men inferiour to none; men to whom the state was as deeply indebted for past service, and whose future services she deemed it as important to retain, as those of the officers in actual service : for these men, under the name of supernumeraries, in contradistinction to officers in actual service, the law meant to provide.” And in another passage he quotes the words of the law thus—“ All offi *60 cers who are now supernumerary, and shall again enter the service if required so to do”—considering these ex- ■ pressions equivalent with those actually used, viz. “ All such officers who have or shall become supernumerary” &c. ■ Judge Green leaves as little doubt of his interpretation of the meaning of the law; for in one passage of his opinion he says—“ I thought, until very recently, that there were strong motives to influence the legislature in making a discrimination between those who served to the end of the war, and supernumeraries, (especially the great number becoming so by the reduction of fourteen regiments or battalions, in 1777, from ten to eight companies, and never again called into the service), and that such discrimination had been made;” but he adds, “ Subsequent reflection has satisfied me I was mistaken.” And judge Coalter, throughout his opinion, argues in favour of supernumeraries in general, both of the continental and state lines, without regard to the time of their becoming supernumerary.
The grounds upon which the court justified its opinion in Lilly's case were, the terms of the law; the motives for making it; the fact that supernumeraries were still officers, liable to be called on at a moment’s warning; that having seen service, the legislature, in anticipation of future exigencies, wished to hold out an inducement to them to retain their commissions; and that thus holding them, they could not enter into inconsistent engagements, nor refuse to enter into active service (without being liable to military censure and punishment) “ if required so-to do.” All these reasons and grounds apply with as much force to officers who were supernumerary at the date of the law, as to those becoming so afterwards.
But let us attend to the occasion of making this law, and its terms.
On the 24th November 1778, congress, adverting to the fact that from the alteration of the military estab *61 lishment, and other causes, many valuable officers had .... been and might be omitted in the new arrangement, as being supernumerary, who from their conduct and services were entitled to the honourable notice of congress, and to a suitable provision until they could return to civil life with advantage,—resolved to give to all supernumerary officers one year’s full pay, and earnestly recommended to the several states to which such officers belonged, to make such farther provision for them as their respective circumstances and merits might have entitled them to. Journals of congress, vol. 3. p. 133.
It is clear beyond question, that congress had reference to all supernumeraries, whether they had leen or might be omitted in the new arrangement; and it is as evident to my mind, that as the act of May 1779 was intended to comply with this recommendation of congress, it meant to include the class of supernumerary officers who had leen or might be omitted in the new arrangement. And what other construction can be given to the words of the last clause, concerning supernumeraries ? which seems to have been added as an amendment to the original bill (see 1 Leigh 53S). “ All such officers who have or shall become supernumerary on the reduction of any of the said battalions”—Can these words be construed to mean any thing but that officers who had become supernumerary already, on the reduction of the battalions, should be entitled to half pay for life, as well as those who should thereafter become supernumerary ; unless we transpose the words, or do violence to their grammatical construction? To me it seems perfectly clear, that no distinction between supernumeraries can be drawn, except the one affirmed in Innis v. Roane, and repudiated by this court in Lilly’s case and many subsequent ones. If supernumeraries, not again entering the service and continuing to the end of the war, are entitled to half pay, the appellant in this case is entitled for the same reasons; and the at *62 tempt to distinguish it from Lilly's case, is in effect to .. . it deny that case to be law.
If there was any reason for believing that Tatum ever refused to enter the service, or had contracted inconsistent obligations, or had resigned and returned to civil life, the case would be very different. But there is no other reason to presume this, than the length of time which elapsed from the autumn of the year 1778 to the end of the war; which is little more than the time which elapsed in other cases, where the officers were allowed their half pay. Various reasons might be assigned for the failure to call these supernumeraries into active service, which I forbear to urge, because it is agreed that he remained a supernumerary officer to the end of the war, and it is not pretended that he was called on and refused. It is also agreed that he was in the Virginia line on continental establishment, which brings him within the words, “ officers commanding in the battalions of this commonwealth on continental establishment and that he was a citizen of Virginia, is not questioned. If so, as no tantamount provision has been made for him by congress, he is entitled to his half pay for life from Virginia; and the judgment denying it ought to be reversed.
Brockenbrough, J.
It appears, that Henry Tatum the testator of the appellant was a lieutenant in the Virginia line in continental service, and continued in service until the new arrangement of the army was made in the fall of 1778, when he retired as a supernumerary officer, and remained as such till the end of the war. But it is not stated to what particular regiment he belonged, nor is it stated whether the regiment of which-he was an officer, was in existence at the time of the passage of the act of May 1779. I think it is apparent, that that act promises half pay for life to the officers of those battalions or regiments only, which were then (that *63 is, at the passage of the act) in existence; and that the promise does not extend to such battalions as had, previously thereto, either by consolidation or discharge, been dispensed with.
1. I am very strongly inclined to the opinion, that, notwithstanding the words “who have become supernumerary,” in the act of May 1779, there were, at that time, no supernumeraries in those continental battalions or regiments which were in existence or in service at that date. That there were supernumeraries as early as 1778, or perhaps earlier, in some of the Virginia continental battalions, is, I think, sufficiently proved. It is proved by the resolution of congress of the 24th November 1778, Journ. Cong. vol. 3. p. 133. which speaks of many valuable officers having been omitted in the new arrangement, as being supernumerary. But several of those Virginia continental battalions had been entirely dispensed with in March 1779, only two or three months before the act of May 1779. Hence it is probable, that the officers deraigned previously to March 1779, and by dispensing with several battalions at that time, were officers of those battalions, and not those of the battalions retained. If I am right in this, then the words before quoted, “ who have become supernumerary,” will have their effect by being applied to the battalions in state service, none of which had been dispensed with previous to the passage of the act.
That four of the Virginia battalions on continental establishment had been dispensed with, or put out of service, by the resolution of congress of March 1779, seems apparent by a reference to the ordinances of the Vi'rginia convention, the acts of assembly, and the resolutions of congress. The Virginia battalions were originally fifteen in number. The two first were raised by virtue of the ordinance of July 1775; seven others by the ordinance of December .1775 ; and the remaining six by the act of October 1776. 9 Hen. Stat. at *64 large, p. 12. 76. 179. On the 9th March 1779, con» • • gress resolved, that the infantry of the United States for the next campaign be composed of eighty battalions; and the number of the Virginia battalions was reduced to eleven. Journ. Cong. vol. 3. p. 223. This shews that four of the Virginia battalions were put out of service. Which they were, who can tell at this day ? Can there be any certainty on this subject, without reference to the rolls of the army ? I think it very probable that the 8th and 9th battalions were put out of service at that time, or previously thereto; but I have found no evidence to shew which of the others were put out of service. As to the 9th, we have record evidence, that it was taken captive by the enemy at the battle of £?ermantown, and the legislature, by the act of October 1777, substituted the first Virginia regiment in its stead. 9 Hen. Stat. at large, p. 337. And as to the 8th, there is a certificate of lieutenant col. Ciarle of that regiment, that it was annexed to the-regiment in 1778 or 1779.
I think it probable that these two battalions, and perhaps two others, were not existing “ battalions of this commonwealth on continental establishment,” at the passage of the act of May session 1779, and if so, their officers are not included in the promise of half pay, because they were not officers “ commanding in the battalions of this commonwealth,” nor could they be “ supernumerary on the reduction of any of the said battalions;” that is, of the battalions then in service.
It does not appear in the case now before us, and . most probably it never can be made to appear, that lieutenant Tatum had ever been an officer in either of the battalions retained under the resolution of congress of March 1779. Unless he was, he had no title to half pay under our act. Colonel Bowman was an officer of the 8th, which was merged, it seems, in some other, and he never was entitled to the half pay.
*65 The view which I have taken was suggested by our brother BrooTce, who was himself a revolutionary officer, and who is satisfied that the Virginia continental officers who became supernumerary were never entitled to half pay from the state.
It is strongly confirmed by the following statement. I think I can confidently assert, that from the midst of our revolution until the year 1833 (a period of more than fifty years) it was not known by any branch of the government of Virginia, legislative, executive or judiciary, that the officers of the continental line had any claim, either legal or equitable, upon the state for the bounty of half pay for life; and if I may judge from the silence of the officers themselves for more than half a century, I should say, that they did not know it, or if they knew it, that they did not choose to assert it. I have examined the journals of the house of delegates for several years, and cannot find the suggestion of such a claim. In December 1781, flagrante bello, the officers of the state battalions and corps presented their memorial to the general assembly, claiming as supernumeraries their half pay for life, and the opinion of the committee (of which mr. Henry was chairman) was in favour of the claim; Journ. Oct. 1781, p. 37. The legislature, without however voting on the resolution asserting their right, did by law direct a return of the state officers, in which return the corps, the rank of each officer, the date of his commission, the number of men at first raised in each corps, the number of men after reduction, and the time of reduction, should be specified, and a discrimination made of such officers as were unworthy of half pay. 10 Hen. Stat. at large, p. 466. It was in obedience to this law, that the board of officers in the particular service of the state sat in Richmond in February and April 1782, and made the report of such of the state line as were entitled, in their judgment, to half pay. The officers of the navy too had presented *66 their memorial, and a board of officers was also called to decide on their claims to half pay, which sat in 1784. But we hear of no such memorial from the officers of the Virginia line on continental establishment. And this did not proceed from any unwillingness to assert their rights; for, in the same session of December 1781, a memorial from them was presented, setting forth the inconveniences they experienced from the depreciation of their pay, and that large arrearages were due them : and a committee, of which mr. Henry was chairman, reported a series of resolutions in their favour. Journ. p. 22. 30. If they had taken the same view of their rights under the act of 1779, that the officers on state establishment did, would they not, at that period, have presented their memorials also ? Would not mr. Henry have reported in their favour as well as in that of the state officers ? So, at the session of May 1783, the officers of the state line and of the state navy presented their'memorials, claiming, amongst other things, their half pay for life : they were before the committee of the whole house, and the chairman reported it as the opinion of the committee, that so much of their memorial as prayed that effectual measures might be taken to secure the said officers their half pay, or a compensation for it, was reasonable, and that adequate funds ought to be established for paying to such officers their half pay agreeable to law. Journ. May 1783, p. 78. 89. 90. Accordingly, during that same session, a bill passed authorizing the auditors to issue to such of the officers of the state line and navy, as were by law entitled to half pay, their warrants for the same; 10 Hen. Stat. at large, p. 266. Then also, the officers of the continental line exhibited no claim for half pay for life. The war was at an end ; the state officers were pressing their claim for half pay; the act of 1779 was as familiar to them as to the state officers; it was familiar to the two branches of the legislature, who passed those resolu *67 lions and that act: why did not those officers then assert the claim ? why did not the legislature, from a sense of justice, then pass a law in their favour, as well as in favour of the state officers ? Why, but because neither the officers themselves, nor either branch of the legislature, had the least conception that they had any right to claim half pay for life from the state government? Nay further, the same officers, at the same session of May 1783, after the war was over, presented a memorial to the legislature, which is thus noticed in the journal, p. 15. “A memorial of the officers of the Virginia line in continental service, on behalf of themselves and the soldiers of the said line, was presented to the house, and read, setting forth, that fully satisfied of the attention of the legislature to their past requisitions, they are induced to represent the inequality and insufficiency of the bounty of lands intended for them, as well as the particular distress of the soldiers, and their inability to survey the said lands ; that in the same confidence, they hope proper funds will be provided for the redemption of the certificates granted them for pay and depreciation; and praying that the assembly will adopt measures for their present relief, as well as to execute the former promises and intention of the legislature in their favour.” The memorial was referred to the committee of propositions and grievances, and the resolutions of that committee were referred to the committee of the whole, and subsequently acted on by the legislature. The officers of thestate line followed suit, and presented their memorial for relief as to their land bounty, and deficiencies of pay and rations, and were in these respects placed on the same footing with the continentals. Now, here were the continental officers claiming their rights of bounty land, and retribution for depreciated pay, at the bands of a willing legislature, and yet not saying one word as to their right to half pay, which their brother officers of the state line were *68 at that moment successfully pressing. Why this omiss*on> but for their conviction that they had no such rightful claim against the state government ? After that period, a controversy arose between the officers of the state line and the different departments of the government, as to their right to half pay, unless they served to the end of the war. On the 22d December 1783, the two houses resolved, that the auditors be directed not to issue any more warrants for the half pay of the state line, until the further order of the general assembly. Whether that resolution was founded on a belief that the act of 1779 had been misconstrued by the legislature in l'/Sl and May 1783, or whether, as has been suggested, it was because funds had not been provided, and the credit of their warrants had depreciated for want of funds, I am not able to ascertain. Nor have I examined the proceedings of the legislature from that time to December 1790, when the legislature gave a construction to the act of 1779, different from that of the two former legislatures, and confined the half pay for life of the officers of the stale line, to those who continued in actual service to the end of the war, and to the supernumeraries who, being afterwards required, did again enter into actual service, and continue therein to the end of the war.
After this legislative construction, the officers of the state line appealed to the courts, and the controversy was kept up in them from 1791 to 1797, with alternate success, when it was supposed to be finally settled. During that period too, we hear nothing of the claims of the supernumerary officers of the Virgi?iia continental line. The doors of the courts of justice were just as open to them during the whole period, as they were to the officers of the slate line, and yet we hear of no claim being set up by them, no pretence of right, till the year 1833. Had these officers exhibited their claims when the state officers did, the legislature might have adopted *69 the same rule with them that they did with the state officers: they might have called on a board of officers to discriminate between the worthy and the unworthy, and to have a complete list of those entitled; but as it is, they are deprived of the means of preventing imposition. I am, for these reasons, strongly impressed with the opinion, that none of the supernumeraries of the continental line previous to May 1779, are entitled to half pay. The supernumeraries produced by the further reduction of the Virginia battalions to eight in October 1780, were provided for by congress.
2dly, I am of opinion, that although the commonwealth is not named in the statutes of limitations, yet where no claim whatever has been set up for a series of years, or, if set up, has been abandoned, it is the duty of the courts to reject a claim condemned by its antiquity. If a claim against the commonwealth, which depends for its justice as well on the evidence as the law, be not exhibited for half a century, why should not the courts guard the public treasury against such stale claims, as well as the fortunes of individuals against claims of a much shorter existence ? If fifty years are no protection against such claims, why should they not be kept alive for a century, or two centuries ? On this ground, I should be of opinion to reject this claim, and leave the claimant to seek for his dues, if he has any, from that branch of the government which represents the sovereignty of the commonwealth.
But, 3dly, if it should be thought that I am wrong in both of these opinions, then the question is, whether the construction of the act of 1779, given by this court in Lilly's case, be a correct one ? and if it be not, whether we are bound by it ? That act has been very differently construed by this court at different times. In the year 1792, the court, consisting of three judges {Lyons, Carrington and Fleming) decided, that only such of the officers who became supernumerary on the reduction of *70 their battalions, as again actually entered into the said ser- # v'lce- in same or a higher rank, having been required so to do, and continued therein until the end of the war, J were entitled to half pay. In 1797, the court, consisting also of three judges {Lyons, Carrington and Roane) gave the same decision. After these two concurring judgments were rendered, there was an acquiescence in them for more than thirty years. At length Lilly’s case came on in 1830, and three of the judges {Coalter, Green and Carr) against the opinion of judge BrooTce, overruled the two former decisions, and declared that supernumeraries, who continued such without being required to reenter the service, were entitled to half pay, and that they only forfeited it, if, on being required to reenter in the same or a higher grade, they refused so to do.
Now, when for the first time a new class of cases is brought before us, (new in being exhibited by continental officers, and in reaching beyond the passage of the law, possibly almost to the commencement of the war) it behooves us to pause, and reconsider our judgments. I should not think of doing so, if the decisions had been uniform; but when the last is expressly opposed to the former ones; when the court was warned of the maxim stare decisis, and refused to listen to it, it cannot be deemed improper for the present court to inquire which of the two constructions is right.
There is but one sentence in the law giving half pay, and that embraces both officers in command and supernumeraries. To me it seems clear, that both clauses of the sentence impose the continuance in the service to the end of the war, as an indispensable condition to the acquisition of half pay for life. It is not disputed, that such condition is imposed on the officers mentioned in the first clause; namely, “ all officers commanding or who shall command, all chaplains, physicians, surgeons, and surgeon’s mates.” The second clause I will quote: *71 “ And all officers who have or shall become supernumerary on reduction of any of the said battalions, and shall again enter into the said service, if required so to do, in the same or any higher rank, and continue therein until the end of the war, shall be entitled to half pay for life.” The condition of continuance in the service until the end of the war, is but once expressed in the whole sentence; and the identical words which are applied to supernumeraries in the last clause, are applied to officers commanding and chaplains &c. in the first. Taking the grammatical construction, the nominatives officers commanding—chaplains—officers supernumerary, are connected together by the conjunction and; and the verb continue agrees with all of those nominatives, so connected together. If then the officers commanding, and the chaplains See. must continue until the end of the war, to entitle them to half pay, so must the officers supernumerary continue to the end of the war.
The half pay is not a reward for past service, but a remuneration or bounty for prospective services: services to be rendered, not for two, three or more years, or for any definite period, but to the end of the war. The legislature do not express any determination to fasten all officers, past, present and future, as pensioners for life on the public treasury; not all who heretofore may have done, or hereafter may do, real service for a time; but only such as shall do that service to the end of the war.
But it may have been asked of the draughtsman of the bill, Is it not absurd to speak of supernumeraries continuing in service to the end of the war ? Supernumeraries are those officers who are out of service by the reduction of their battalions; their services are not wanting for those battalions ; they have no right to render service in them after being deraigned, and cannot continue till the end of the war.—To this the reply probably was, Although out of service when deraigned, *72 yet it may be the policy of the legislature to fill up those reduced battalions by new enlistments of soldiers s if they are so filled up, it may be good policy to call back into service the deraigned officers, or at least some of them (perhaps not all, for all are not skilled in war); and it may be a fit opportunity to separate the wheat from the chaff, the good officers from the indifferent ones, giving to the latter their full pay and bounty lands, and to the former, besides their full pay and bounty lands, the additional bounty of half pay for life, if, when they are called, they come, and continue to serve to the end of the war.—Some such view was most probably taken of the subject, and hence the words in the act, which have been the subject of so much criticism— “ and shall again enter into the said service, if required so to do."
It is asked, why insert these words, “if required so to do” ? are they mere surplusage ? I think they are not mere surplusage. It cannot be surplusage to use words which convey the writer’s idea accurately, although perhaps they would be understood were they omitted. The writer knew, that a supernumerary could not voluntarily enter again into the said service, in the same or a higher rank; he knew, that he must be called on or required so to enter. If he had said, “ and all supernumeraries who shall enter again into the said service, in the same or a higher rank, and shall continue therein to the end of the war, shall be entitled to half pay during life,” he knew it might be understood that he meant, that all of them who should be called on or required to enter again, and only such, should be entitled; but why not as well express the idea at once, as leave it to be understood? This accounts for the expression, “ if required so to dowhich means nothing more than when required, or on being required. But the conjunction if imports a condition ; so does the word when, or the words on being: but the insertion of that condi *73 lion does not destroy or impair the other indispensable ... ,, .... . , condition oi continuing in the service to the end oi trie war. I do not see in what more appropriate language the legislature could have expressed the idea.
I do not see the necessity of striking out those words; but if the construction adopted in Lilly’s case is to prevail, that supernumeraries are to have half pay, although they do not continue in service to the end of the war, because the government will not require them, then we must either expunge the significant words “and continue therein till the end of the war;” or, if we retain all the words of the clause, then we must add to the end of it an expression to this effect: “ but if the commonwealth shall not require the said officers again to enter the service as aforesaid, the said supernumeraries shall still be entitled to their half pay as aforesaid.”
The principal stumbling block with chancellor Wythe, was the words command or service; and judge Carr seems to have adopted the same idea. It is successfully combated by judge Broofce in his opinion in Lilly’s case (p. 564.) and judge Green acceded to that proposition. The words command or service are to be taken dislributively, the former applying to officers who had a command, the latter to those of the staff who bad no command. The officers commanding, or who shall command, and the supernumeraries of the same character, shall have half pay from the determination of their commands; and chaplains, physicians, surgeons, and surgeon’s mates, and supernumeraries of the same character, from the determination of their services.
From the language of this law, I can see no legal obligation on the government, either to fill up the old battalions by new enlistments, or to call on the old officers to command them if they were so filled up. If the government was not legally bound to require them to reenter the service,—if it might dispense with their future services, I do not see how it can be inferred from’ the *74 use of the words “ if required so to do,” that the failure . , , . . to require them gave to the supernumeraries the same right to half pay, that the requisition, and a compliance with it to the end of the war, would have done.
But it was said by judge Carr, if the supernumeraries not required to reenter the service, are not entitled to half pay, why mention them at all by that name ? if they again enter the service, they cease to be supernumeraries ; they are officers in service, and come within the first clause of the law. The answer to this is given by judge Green. “A special provision,” he says, “was necessary for supernumeraries, if they were intended to be provided for in any case whatever; since none such, whether then being, or thereafter becoming supernumerary, could claim under the former part of the provision, as they could not claim as having served (henceforth’ (from the passing of the act) ‘ or from the time of their being commissioned, until the end of the war.’ ”
I cannot think with judge Green, that the expression “ if required so to do,” pervades and qualifies the whole sentence. I do not see on what principle of sound construction, we can give that expression a different collocation in the sentence, from that which the legislature gave it. It obviously refers to its immediate antecedent “ shall again enter into the service,” and not to the subsequent phrase “ and continue therein until the end of the war.” After the supernumerary shall, according to the requisition of the government, enter again into the service in the same or any higher rank, then he shall be entitled to half pay for life, provided he (like the officer commanding) shall continue therein until the end of the war.
The words “in the same or any higher rank,” were inserted to save the honour of the officer. Holding his old commission, it would be degrading him to require him to reenter in an inferiour rank. Whilst the govern *75 ment enters into no obligation to cali upon him again, . „ . . ... . , . . , yet if it exercises the right to do so, this is a pledge that he shall not be in such inferiour rank. But I cannot see that this expression has any effect whatever on the condition on which the supernumerary is to have his half pay; namely, that when he enters, he is to serve to the end of the war.
I think the judgment should be affirmed.